STATE OF MICHIGAN
COURT OF APPEALS

MATTHEW DYE, by his Guardian, SIPORIN & ASSOCIATES, INC.,

                        Plaintiff-Appellee,

v

ESURANCE PROPERTY & CASUALTY INSURANCE COMPANY and PRIORITY HEALTH,

                        Defendants/Cross-
                        Plaintiffs/Appellees

and

GEICO INDEMNITY COMPANY,

                        Defendant/Cross-
                        Defendant/Appellant,

and

BLUE CROSS BLUE SHIELD OF MICHIGAN,

                        Defendant-Appellee.

.

UNPUBLISHED
April 4, 2017

No.   330308
Washtenaw Circuit Court
LC No.   14-000516-NF

Before:  BECKERING, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

In this interlocutory appeal involving a dispute about the payment of personal injury protection (PIP) benefits, defendant/cross-defendant Geico appeals by leave granted[1] the trial court's November 13, 2015 order denying Geico's motions for summary disposition as to

---

[1] *Matthew Dye v Esurance Prop & Cas Ins Co*, unpublished order of the Court of Appeals entered April 5, 2016 (Docket No. 330308).

plaintiff Matthew Dye[2] and defendant/cross-plaintiff Esurance, and granting their summary disposition motions against Geico.[3] All summary disposition motions sought relief pursuant to MCR 2.116(C)(10)(no genuine issue of material fact, and moving party entitled to judgment as a matter of law). On appeal, Geico contends that the trial court erred in finding plaintiff's father to be an "owner," for purposes of the no-fault act, MCL 500.3101 *et seq.*, of the vehicle plaintiff was driving at the time he sustained injuries, and in finding an enforceable settlement agreement between Geico and Esurance requiring Geico to reimburse Esurance for PIP benefits already paid to plaintiff. For the reasons set forth herein, we reverse and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff suffered a traumatic brain injury and other serious injuries in a September 26, 2013 motor vehicle accident while driving a 1997 BMW that he had purchased two months earlier. At the time of the purchase, plaintiff's father, Paul Dye, registered the vehicle on his son's behalf at the Secretary of State's Office and obtained insurance for it from Esurance online; however, the declarations page of the policy only identifies Paul as the named insured. Plaintiff's wife, Lisa, whom he had married in May of 2013, owned a Dodge Caravan insured under a Geico policy; neither plaintiff nor the BMW were listed on Lisa's policy.

When neither Geico nor Esurance paid plaintiff's PIP benefits, plaintiff filed a complaint against both alleging breach of contract. Thereafter, Esurance paid plaintiff approximately $388,068.36 in PIP benefits. Subsequently, it was discovered that plaintiff was living with his wife at the time of the accident, not his father, thus making Geico higher than Esurance in the order of priority for payment of PIP benefits. Thereafter, Geico acknowledged to plaintiff and to Esurance that it was "primary," and requested demands from both. Esurance responded with a demand for $388,068.36 in benefits paid, plus legal fees, which Esurance was still "pulling together" but estimated would be around $3,000, and an agreement that Geico would "take over the claim."

On October 20, 2014, with its demand still unresolved, Esurance's attorney sent Geico's attorney an e-mail stating: "I am out of time on this file to wait for a resolution. I will need to proceed with a motion for leave to file a cross-claim this week if we are not resolved by tomorrow." The following day, Geico's attorney wrote in response, "I just spoke with my adjuster, they are going to send the check to our office tomorrow made payable to Esurance. I am working on a Release . . . ."

On November 5, 2014, Geico e-mailed Esurance the following:

---

[2] The actual plaintiff is Matthew Dye's guardian, Siporin and Associates. However, as the parties refer to Dye as "plaintiff," we will do the same for the sake of consistency.

[3] Although Priority Health and Blue Cross Blue Shield of Michigan are named as appellees, they have not submitted briefs and are not participating in this appeal.

Please find attached for your review the draft of the release and settlement for the amount of $391,212.54.

The settlement number comes from:

The amount Esurance has paid to date in benefits for or on behalf of Mr. Dye: $388,068.54[4]

Attorney fees: $3,019.00

Costs: $125.18

Upon your approval, please send back a signed copy and we will forward the check in the amount of $388,068.36 and will immediately request a check from our client for the remaining balance. I would expect that the check for attorney fees and costs to be promptly forwarded to our office.

The release and settlement agreement attached to Geico's email indicated in pertinent part that "[f]or sole consideration of the total sum of . . . $391.212.54, ESURANCE . . . does hereby release and forever discharge GEICO . . . from any and all past, present and future claims, demands, damages, costs, expenses, actions, and causes of action . . . ."

Later that day, Esurance's counsel replied that she could not agree to release future claims. "In the "unlikely event that Geico stopped paying for some reason and Esurance was drawn back into the claim, I would not want to waive any future claims." She wrote, "If you take out the wording 'past, present or future' that would cover all claims Esurance would have against Geico through the present. Let me know if that is agreeable."

The following day, Geico's counsel responded, "I fully understand the need for the Release language regarding the Future claims, I will adjust that portion accordingly." Geico's counsel added that Geico had recently "raised concerns with paying any of Esurance's demands for attorney fees[,]" explaining that he could find no authority requiring Geico to pay Esurance's attorney fees in circumstances such as these, and invited Esurance's counsel to draw his attention to any such authority that might exist. Geico's attorney thanked Esurance's attorney for "her constant availability in trying to resolve this case."

On November 10, 2014, Esurance's attorney e-mailed Geico's attorney indicating that she was "confused" because she "thought we were settled?" She expressed her surprise and frustration that Geico was questioning whether to pay Esurance's attorney fees. She wrote, "[t]hey are incredibly lucky that they are not facing a far bigger attorney fee and interest from the claimant" and asking Geico's attorney to forward the revised release so they could wrap matters up. Esurance's attorney did not indicate that she would agree to forego payment of attorney fees.

---

[4] Now and again in the record there appears an eighteen-cent variance in the PIP benefits Esurance paid to plaintiff.

When Geico did not reply, Esurance repeated its request for the revised release on November 12, 2014.

On November 13, 2014, *Barnes v Farmers Ins Exch*, unpublished opinion per curiam of the Court of Appeals, issued July 29, 2014 (Docket No. 314621), was re-designated as "for publication," and Geico withdrew its offer.[5] Subsequently, Esurance filed a cross-claim against Geico requesting a declaratory judgment that Geico was the insurer of highest priority for plaintiff's PIP benefits, and alleging that Geico breached its agreement to reimburse Esurance for the benefits paid, plus attorney fees.

In separate depositions taken in June 2015, plaintiff, Paul, and Lisa asserted that Paul was effectively a co-owner of the BMW plaintiff was driving at the time of the accident. Paul testified that when plaintiff went to Afghanistan in 2010 and 2011, he executed a military power of attorney giving Paul the legal authority to conduct transactions on his behalf and to access his bank accounts, and Paul said he continued to provide whatever help he could to plaintiff after he returned from deployment. Paul testified that he and plaintiff discussed the purchase of the BMW, and that he contributed to the purchase by obtaining and paying for insurance for the car on Esurance's website, physically going to the Office of the Secretary of State and registering the car—although he registered it in plaintiff's name by exercising a power of attorney given him by plaintiff—and by paying the registration fee. Paul testified that he could use the BMW at his discretion, but acknowledged that he would make prior arrangements to make sure that no one else needed the car. Paul also testified that all of the Dye family members' vehicles were "available for [] use kind of as a matter of right as being part of the family," though they would not take them without asking. Accordingly, he "had the right to use the [BMW] . . . as part of the kind of Dye fleet of vehicles," and that plaintiff had the right to Paul's vehicle when he wanted to do so.

In their depositions, plaintiff and Lisa generally agreed with Paul's representations. Plaintiff testified that he paid the purchase price for the BMW, paid for its gas, and probably would have paid for repairs had it needed any during the approximately two months that he owned it before the accident. Nevertheless, he testified that Paul could use the BMW at Paul's own discretion, that when it came to vehicles, that "it was more than, you know, back and forth use and when you needed," and that Paul was a "part owner." Lisa testified that when Paul took part in the discussion about purchasing the BMW, the understanding was that Paul could use it whenever he wanted to. She agreed that during the five-year period that she has been in a relationship with plaintiff, "Matt and his dad kind of interchange cars and vehicles at will, kind of a family, Dye vehicle deal."

Geico moved for summary disposition of Esurance's cross-complaint, asserting that the e-mail exchanges in November 2014 showed that Geico and Esurance had not agreed on all of

---

[5] As discussed elsewhere in this opinion, the Court held in *Barnes* that "when none of the owners maintains the requisite coverage, no owner may recover PIP benefits." *Barnes v Farmers Ins Exch*, 308 Mich App 1, 8-9; 862 NW2d 681 (2014). Thus, a major issue in the instant case became whether Paul was considered an owner or registrant of the BMW under the no-fault act.

the terms of a settlement before Geico withdrew its offer. Geico also moved for summary disposition of plaintiff's claim, asserting that plaintiff was not entitled to PIP benefits in light of *Barnes* because he owned the subject vehicle but had not insured it and the person who had insured it, Paul, was not an owner as defined in MCL 500.3101(2)(k). Esurance moved for summary disposition on its cross complaint to enforce its alleged settlement agreement with Geico and to have the court declare Geico the insurer of first priority with regard to plaintiff's PIP benefits. Lastly, plaintiff moved for summary disposition, contending in relevant part that *Barnes* was wrongly decided, and that Paul was an "owner" and a "registrant" for purposes of the no-fault act because he had the right to use the BMW and he had physically registered the vehicle.

Rejecting Geico's *Barnes* defense, the trial court summarized its findings as follows:

> [E]ven under the *Barnes* decision the request is granted and I find there's no genuine issue of fact and I find summary disposition both for the Plaintiff and for Esurance, finding coverage for the accident to Matt Dye against Geico. The only issue is the amount of damages that each of you are [sic] entitled to receive.

As noted above, the trial court entered an order granting plaintiff's and Esurance's motions for summary disposition and denying those brought by Geico.

## I. Analysis

### A. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Auto Club Group Ins Co v. Burchell,* 249 Mich App 468, 479; 642 NW2d 406 (2002). The parties brought their respective summary disposition motions under MCR 2.116(C)(10), which tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). "Where the moving party has produced evidence in support of the motion, the opposing party bears the burden of producing evidence to establish that a genuine issue of disputed fact exists." *Ardt v Titan Ins Co*, 233 Mich App 685, 688; 593 NW2d 215 (1999). If the documentary evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the trial court may grant the motion. *Quinto*, 451 Mich at 362; MCR 2.116(C)(10).

### B. PLAINTIFF'S ENTITLEMENT TO PIP BENEFITS: DETERMINATION WHETHER PAUL DYE WAS AN OWNER OR REGISTRANT OF THE BMW

Geico admits that plaintiff's status as a resident of its insured, Lisa, at the time of the accident would make Geico first in priority for his PIP benefits under the no-fault act. However, Geico argues that plaintiff is ineligible for coverage from any insurance because Paul, the person who insured the BMW plaintiff was driving, was not an owner or registrant of the vehicle. Consequently, in light of *Barnes*, plaintiff, as an owner of the BMW, is not entitled to be paid

PIP benefits pursuant to MCL 500.3113. Geico contends on appeal that the trial court erred in determining that plaintiff was entitled to PIP benefits by finding that Paul was an owner and a registrant of the BMW.

"Normally, a person who sustains an accidental bodily injury in a motor vehicle accident must first look to no-fault insurance policies in his household for no-fault benefits." *Michigan Mut Ins Co v Farm Bureau Ins Group*, 183 Mich App 626, 630; 455 NW2d 352, (1990), citing MCL 500.3114(1). However, under MCL 500.3113(b), a person is not entitled to personal protection [PIP] benefits if, at the time of the accident, he or she "was the owner or registrant of a motor vehicle . . . involved in the accident with respect to which the security required by section 3101 or 3103[6] was not in effect." MCL 500.3101(1) provides in relevant part that "[t]he owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance . . . ." Although a motor vehicle may have more than one owner for purposes of the no fault act, see *Ardt*, 233 Mich App at 692, it is not sufficient that a vehicle is insured by just anyone, see *Barnes*, 308 Mich App 1, 8-9; 862 NW2d 681 (2014). At least one owner or registrant must have the insurance required by MCL 500.3101(1), and "when none of the owners maintains the requisite coverage, no owner may recover PIP benefits." *Id*.

## 1. REGISTRANT

Geico contends that the trial court erred as a matter of law in finding that Paul was a "registrant" of the BMW for purposes of MCL 500.3101(1). We agree.

Although " 'registrant' is not clearly defined in the Insurance Code," *Titan Ins Co v State Farm Mut Automobile Ins Co*, 296 Mich App 75, 86; 817 NW2d 621 (2012), this Court has made clear that the "registrant" is the person whose name is on the vehicle's title at the time of the accident for which PIP benefits are sought, see *id*. at 92. See also *Cason v Auto-Owners Ins Co*, 181 Mich App 600, 607-608; 450 NW2d 6 (1989) (concluding that the person named on the title at the time of the accident is the registrant).

In the case at bar, although it is undisputed that Paul was the one who physically went to the Office of the Secretary of State and signed the "Application for Michigan Vehicle Title," it is equally undisputed that he did so on plaintiff's behalf, and signed the application as plaintiff's attorney-in-fact under the power of attorney granted him by plaintiff. Paul testified that he took plaintiff's handwritten note granting him power of attorney to the Secretary of State's office, and registered the BMW in plaintiff's name, not in his own. In the absence of any evidence that Paul's name was on the vehicle's title at the time of the accident for which PIP benefits are sought, Paul cannot, as a matter of law, be the "registrant" of the BMW, *Titan Ins Co*, 296 Mich App at 92, and the trial court erred in ruling otherwise.

---

[6] MCL 500.3103 is not applicable to the present case as it addresses motorcycle security requirements.

## 2. OWNER

Geico argues that the trial court erred in finding Paul to be an owner of the BMW for purposes of MCL 500.3101(1) because Paul used the BMW sporadically at best, and not in ways consistent with ownership. Conversely, plaintiff contends that Paul was an owner because he had a continuous right to use the BMW and an established pattern of sharing vehicles with plaintiff and other members of his family, and because of the particular circumstances surrounding plaintiff's relationship with his father. Esurance simply asserts that Paul was an owner for purposes of MCL 500.3101(1).[7]

For purposes of determining whether a person is qualified to receive PIP benefits, unless reasonable minds could not differ, "[t]he question of ownership [of a vehicle] is one of fact that has to be decided by the factfinder." *Botsford General Hosp v Citizens Ins Co*, 195 Mich App 127, 133-134; 489 NW2d 137 (1992) (citations omitted) (the Court concluded that the trial court did not err in permitting the question of a vehicle's ownership to be decided by the jury rather than granting the insurance company's motion for a directed verdict because, "viewing the evidence in the light most favorable to plaintiff, we find that there was a question of fact concerning ownership").

Relevant to this case, "owner" is statutorily defined to include "[a] person renting a motor vehicle or having the use thereof, under a lease or otherwise, for a period that is greater than 30 days." MCL 500.3101(2)(k)(*i*). "Having the use" of a motor vehicle for the purpose of defining "owner" under MCL 500.3101(2)(k) "means using the vehicle in ways that comport with concepts of ownership." *Ardt*, 233 Mich App at 690.[8] Ownership implies proprietary or

---

[7] Both plaintiff and Esurance argue in their briefs to this Court that resolution of this issue is governed by *Iqbal v Bristol West Ins Group*, 278 Mich App 31; 748 NW2d 574 (2008), rather than *Barnes*, 308 Mich App 1 (2014). In *Iqbal*, the Court concluded, "that the issue regarding whether [the plaintiff] was the 'owner' of the vehicle under MCL 500.3101(2)(k) was irrelevant for purposes of analysis under MCL 500.3113(b), where the vehicle was specifically insured by plaintiff's brother." *Iqbal*, 278 Mich App at 33. In *Barnes*, the Court held that "when none of the owners maintains the requisite coverage, no owner may recover PIP benefits." *Barnes*, 308 Mich App at 8-9. Based on these statements, plaintiff and Esurance argue respectively that *Barnes* conflicts with *Iqbal*, or that *Barnes* stands for the limited holding that where no insurance policy is "in effect," a vehicle does not meet the coverage requirements of MCL 500.3101(1). We disagree with both propositions. The issue presented in *Iqbal* was whether *every* owner of a vehicle had to insure the vehicle while the question in *Barnes* was whether *any* owner had to obtain insurance. In *Iqbal*, the Court was not asked to decide whether insurance procured by someone who was not an owner met the requirement of MCL 500.3101(1), and a fair reading of the case indicates the Court's operative assumption that insurance would be procured by an owner or registrant. Thus, we do not believe that *Barnes* conflicts with *Iqbal* or establishes a new rule of law. Even if it did, MCR 7.215(J)(1) obligates us to follow *Barnes*.

[8] *Ardt* refers to MCL 500.3101(2)(g), which was the relevant provision prior to amendment of the statute by 2014 PA 492, effective January 13, 2015. The amendment addresses the definition

possessory usage "as opposed to merely incidental usage under the direction or with the permission of another." *Id*. at 691; see also *Detroit Med Ctr v Titan Ins Co*, 284 Mich App 490, 493-494; 775 NW2d 151 (2009) (an injured driver was not an owner where she used the vehicle sporadically and subject to the owner's permission).

Although a vehicle may have multiple owners for purposes of MCL 500.3101(2)(k), *Ardt*, 233 Mich App at 691, only one of them needs to have the statutorily required no-fault coverage on the vehicle to fulfill the requirements of MCL 500.3101(1), *Iqbal v Bristol West Ins Group*, 278 Mich App 31, 45; 748 NW2d 574 (2008). However, as previously indicated, the person who obtains the statutorily required insurance coverage must be an owner or registrant of the insured vehicle. *Barnes*, 308 Mich App at 8-9. Finally, nothing in the definition of "owner" set forth by MCL 500.3101(2)(k)(*i*) requires

> (1) that a person has at any time *actually used* the vehicle, or (2) that the person has *commenced* using the vehicle at least thirty days before the accident occurred. The statute merely contemplates a situation in which the person *is renting or using* a vehicle for a period that is greater than thirty days. [*Twichel v MIC Gen Ins Corp*, 469 Mich 524, 530-531; 676 NW2d 616 (2004)].

Thus, "[i]t is the nature of the right to use the vehicle—whether it is contemplated that the right to use the vehicle will remain in effect for more than thirty days—that is controlling, not the actual length of time that has elapsed." *Id*. at 532.

In the case at bar, Geico contends that Paul's use of the BMW was sporadic and incidental at best. Paul did not contribute to the BMW's purchase price, could not remember driving it, could not remember garaging it, did not have his own set of keys to the car, and said he would ask plaintiff's permission if he ever had reason to use it. The trial court, however, found dispositive the deposition testimony of plaintiff and Paul asserting Paul's continuous right to use the BMW.

Indeed, both plaintiff and Paul testified that Paul could use the car at his discretion and without direction or permission from anyone. Although Paul testified that he would ask first before swapping vehicles, his and plaintiff's testimony indicates that obtaining permission was more for the purpose of coordinating use of the vehicles and respecting the rights of others than for asking for the right to use an otherwise available vehicle. In addition, as was the case in *Detroit Med Ctr*, 284 Mich App at 493, there was a significant relationship between Paul and plaintiff. The relationship appears to have been close, both geographically, as Paul lived only a few blocks from plaintiff, and personal, as Paul served as plaintiff's attorney-in-fact for plaintiff's personal business matters during plaintiff's deployment to Afghanistan and assisted him in like matters thereafter. Moreover, Paul undertook to register the BMW with the Secretary of State's Office, albeit on plaintiff's behalf, but he also paid the registration fee and the

---

of "owner" in the context of motorcycle ownership and, therefore, is not applicable to the instant dispute.

insurance premium. Plaintiff also testified that he considered Paul to be a "part owner."[9] The continuous nature of Paul's right to use the BMW, testimony asserting his right to use the car at his discretion, the broader context of plaintiff's and Paul's relationship, and their history of shared vehicle usage supports the trial court's finding that Paul was an owner for purposes of the no-fault act.

Nevertheless, as Geico points out, Paul did not have his own set of keys and, although plaintiff testified that a spare set was available to Paul to take and use at will, reasonable minds could differ as to whether the nature of Paul's access to the keys supported or hindered a proprietary or possessory use of the BMW. In addition, reasonable minds could differ as to whether Paul's actual usage of the BMW during the two months prior to the accident sufficiently establishes a pattern of regular usage. The testimony itself is somewhat conflicting; Paul could not remember[10] driving or parking the car at his house during the two months since it had been purchased, but plaintiff remembered that Paul had kept the car overnight, and Lisa remembered that Paul had driven it once or twice for a day or two during the two months that they had the car. Lisa's description of Paul's use of the car might signify a "spotty and exceptional pattern," and her testimony that Paul used the car because they needed to use his vehicle appears to be usage that was "merely incidental" rather than "proprietary or possessory." *Ardt*, 233 Mich App at 691. However, plaintiff only had the car for two months, and it might be questionable whether a pattern of any sort could arise during such a short period. Furthermore, as noted above, in *Twichel*, 469 Mich at 532, our Supreme Court has suggested that, when determining whether a person is an owner for purposes of the no-fault act, a person's actual usage of a vehicle is analytically subordinate "to the nature of a person's right to use the vehicle."

The relationship between plaintiff and Paul, their history of sharing vehicles, and testimony regarding the nature of Paul's continuous right to use the BMW without direction or permission may support the trial court's finding that Paul is an owner for purposes of the no-fault act. However, circumstances surrounding Paul's access to the car keys and the actual usage Paul made of the car during the two months prior to the accident could lead a reasonable juror to a contrary conclusion. Accordingly, we conclude that the trial court erred in granting plaintiff summary disposition, as reasonable minds could differ as to whether Paul was an owner of the BMW. *Botsford General Hosp*, 195 Mich App at 133-134.

---

[9] Although Geico takes issue with the admissibility of plaintiff's testimony that Paul was a "part owner" of the BMW, claiming that it calls for a legal conclusion, plaintiff's understanding regarding his father's ownership interest in the BMW is certainly relevant to the issue under consideration by the factfinder, and the factfinder is free to make credibility determinations and weigh all of the evidence before determining whether Paul was an owner. Notably, it "is the nature of the right to use the vehicle—whether it is *contemplated* that the right to use the vehicle will remain in effect for more than thirty days—that is controlling. . . . " *Twichel*, 469 Mich at 532 (emphasis added).

[10] Paul testified that he suffers from multiple sclerosis, and that the disease affects his memory.

## C. SETTLEMENT AGREEMENT

Geico contends that the trial court erred by finding that Geico and Esurance had an enforceable settlement agreement regarding Geico's assumption of responsibility for the claim and reimbursement to Esurance for PIP benefits paid. Geico argues that the e-mails relied upon by the trial court to reach this conclusion clearly show that there was no "meeting of the minds" with regard to all of the essential terms of the alleged settlement. Esurance argues that the trial court ruled correctly because the emails reveal they did come to an agreement and Geico breached the agreement by attempting to back out of the settlement upon issuance of *Barnes* as a published opinion.

Under MCR 2.507(G), in order for a settlement agreement to be binding, it must be made in open court or "in writing, subscribed by the party against whom the agreement is offered or by that party's attorney." An email exchange can satisfy the "writing, subscribed" requirement. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 459; 733 NW2d 766 (2006).

> The existence and interpretation of a contract are questions of law reviewed de novo. An agreement to settle a pending lawsuit is a contract and is to be governed by the legal principles applicable to the construction and interpretation of contracts. Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed. Further, a contract requires mutual assent or a meeting of the minds on all the essential terms. [*Id*. at 452 (quotation marks and citations omitted).]

The record shows that Geico extended an offer to pay Esurance $391,212.54 in exchange for Esurance's agreement not to sue Geico for and to release Geico from "any and all past, present, and future claims, demands, costs, expenses" relative to benefits paid to or on behalf of plaintiff in connection with his motor vehicle accident of September 26, 2013. Esurance did not accept this offer "unambiguous[ly] and in strict conformance with the offer." *Id*. at 452. Instead, Esurance counter-offered by asking Geico to remove the language about "future claims." Geico did not accept this counteroffer "unambiguous[ly] and in strict conformance with the offer." *Id*. Although Geico agreed to remove the language about future claims, it, too, made a counteroffer, asserting that it would not pay Esurance's attorney fees and costs unless shown authority obligating it to do so. The effect of this counteroffer was to change the amount Geico was willing to pay as consideration for Esurance's release. However, Esurance did not accept this counteroffer "unambiguous[ly] and in strict conformity with the offer." *Id*. Esurance expressed disbelief that Geico was not going to pay Esurance's relatively small demand for attorney fees. It requested a revised release, but failed to indicate unambiguously whether it accepted Geico's counteroffer not to pay attorney fees and costs, and, thus, to reduce its payment to Esurance accordingly, or whether it was standing by its request for attorney fees and seeking a revised release that removed the "past, present, or future" language. Absent an acceptance that is "unambiguous and in strict conformance with the offer, no contract is formed." *Id*.

Esurance relies on *Kloian* to contend that the parties had an agreement, at least with regard to Geico's payment of PIP benefits. Esurance's reliance is misplaced.

In *Kloian*, the plaintiff offered to settle his lawsuit against the defendant by accepting "payment of $48,000 in [ex]change for a dismissal with prejudice of all claims and a release as [sic, of] all possible claims." *Id*. at 451. The plaintiff's attorney conveyed these terms to the defendant's attorney via e-mail, in response to which the defendant's attorney wrote on March 18, 2005, "[Defendant] accepts your settlement offer." *Id*. Thereafter, however, the plaintiff decided he wanted "the protection of a mutual release." *Id*. Although the defendant cut a check for the plaintiff and indicated that it was going to revise the prior release to reflect the plaintiff's request for a mutual release, the plaintiff refused to sign the agreement.

On May 18, 2005, both parties moved the trial court to approve the settlement and close the case, plaintiff's counsel noting in his motion that, contrary to the advice of counsel, plaintiff refused to sign the agreement reached by the parties on or around March 18, 2005. *Id*. at 451-452. The trial court found that the parties had entered into a binding agreement on March 18, 2005, and that the request for a mutual release constituted a request to modify the contract that the defendant accepted. Accordingly, the trial court issued an order enforcing the settlement agreement and dismissing the plaintiff's claims with prejudice. *Id*. at 452.

The plaintiff argued on appeal that the trial court erred in enforcing the settlement agreement because there had not been a meeting of the minds. *Id*. However, this Court agreed with the trial court that the March 18, 2005 e-mail from plaintiff's attorney to defendant's attorney that plaintiff would accept $48,000 in exchange for dismissal with prejudice of all claims and a release from all possible claims constituted a settlement offer, and the defendant's e-mail in response constituted an unambiguous acceptance of that offer. *Id*. at 453. The Court explained that these two e-mails demonstrated that "[t]here clearly was a meeting of the minds on the essential terms of the agreement[,]" which were "the payment of $48,000 by defendant in exchange for a dismissal with prejudice and a release." *Id*. at 454.

Esurance asserts that under the reasoning of *Kloian*, the parties had an enforceable agreement on October 21, 2014, that Geico was at least going to reimburse Esurance for PIP benefits even though, as was the case in *Kloian*, the parties had not hammered out the details of the release. The flaw in Esurance's argument is that, unlike the parties in *Kloian*, Geico and Esurance never agreed to the total Geico would pay in consideration for Esurance's release. As indicated above, the release recited an offer of $391,212.54; however, Esurance took issue with the extent of the release. Geico was willing to revise the release as proposed by Esurance, but Geico indicated that it did not want to pay attorney fees without authority obligating it to do so, which amounted to a counteroffer in exchange for a reduction in the consideration amount to be paid. Esurance never articulated its unambiguous acceptance to forego receipt of attorney's fees before Geico withdrew its offer. Although the issuance of *Barnes* promptly snuffed out what appears to have been a "nearly done" deal, the parties had not yet reached a meeting of the minds on all of the essential terms, and the trial court erred in granting Esurance's motion for summary disposition on its cross-claim for enforcement of the alleged agreement.

## III. CONCLUSION

For the reasons set forth above, we conclude that the trial court erred as a matter of law in finding Paul Dye a "registrant" for purposes of MCL 500.3101(1), and that genuine issues of material fact remain with regard to whether Paul was an "owner" of the vehicle plaintiff was driving at the time of his accident for purposes of determining whether plaintiff is entitled to PIP benefits. We also conclude that the trial court erred in granting Esurance's motion for summary disposition on its cross-claim for enforcement of the alleged settlement agreement. Accordingly, we reverse the trial court's order granting summary disposition to plaintiff and Esurance and remand for further proceedings consistent with this opinion.

Reversed and remanded. We do not retain jurisdiction.


/s/ Jane M. Beckering
/s/ Stephen L. Borrello